## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION
## CIVIL ACTION NO. 3:21-CV-00145-RGJ-CHL

**WILLIAM M.,**[1]                                                                    **Plaintiff,**

**v.**

**COMMISSIONER OF SOCIAL SECURITY,**                              **Defendant.**

### REPORT AND RECOMMENDATION

Before the Court is the Complaint filed by Plaintiff, William M. ("Claimant").  Claimant seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner").  (DN 1.)  This case was referred to the undersigned Magistrate Judge to prepare a report and recommendation.  (DN 14.)  Claimant and the Commissioner each filed a Fact and Law Summary.  (DNs 15, 21.)  Therefore, this matter is ripe for review.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **REVERSED** and that this matter be **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), to the Commissioner for reconsideration with instructions to conduct additional proceedings to remedy the herein identified defects in the original proceedings.

### I.    BACKGROUND

On or about June 12, 2018, Claimant protectively filed an application for disability insurance benefits ("DIB") and supplemental security income ("SSI") alleging disability beginning on August 2, 2017.  (R. at 16, 138-39, 160-61, 311-23.)  On August 27, 2019, Administrative Law Judge ("ALJ") Candace McDaniel ("the ALJ") conducted a hearing on Claimant's application.  (*Id.* at 43-84.)  Subsequent to the hearing, Claimant was sent for a post-hearing consultative

---

[1] Pursuant to General Order 22-05, the Plaintiff in this case is identified and referenced solely by first name and last initial.

examination, and Claimant's counsel requested a supplemental hearing.  (*Id.* at 416, 2204-14.)
The ALJ held the supplemental hearing on July 21, 2020.  (*Id.* at 85-121.)  In a decision dated
August 4, 2020, the ALJ engaged in the five-step sequential evaluation process promulgated by
the Commissioner to determine whether an individual is disabled as well as the eight-step
continuing disability review ("CDR") process promulgated by the Commissioner for determining
whether an individual's disability continues after a previous finding of disability.  (*Id.* at 12-42.)
In doing so, the ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security
     Act through June 30, 2018.  (*Id.* at 20.)

2.   The claimant has not engaged in substantial gainful activity since August 2,
     2017, the date the claimant became disabled.  (*Id.*)

3.   From August 2, 2017[,] through February 28, 2019, the period during which
     the claimant was under a disability, the claimant has the following severe
     impairments: thoracic degenerative disc disease, lumbar degenerative
     disc disease, right-sided rib fractures, left leg injury with residuals; [*sic*] and
     cervical degenerative disc disease.  (*Id.* at 20-21.)

4.   From August 2, 2017[,] through February 28, 2019, the claimant did not have
     an impairment or combination of impairments that met or medically equaled
     the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix
     1.  (*Id.* at 22.)

5.   [F]rom August 2, 2017[,] through February 28, 2019, the claimant had the
     residual functional capacity to perform sedentary work as defined in 20 CFR
     404.1567(a) and 416.967(a) except no lifting, carrying, pushing or pulling
     over 15 pounds; [*sic*] no climbing of ladders or stairs.  He needed to change
     positions every 20 minutes. He could perform no kneeling, crouching, or
     crawling.  (*Id.* at 22.)

6.   From August 2, 2017[,] through February 28, 2019, the claimant was unable
     to perform any past relevant work.  (*Id.* at 28.)

7.   The claimant was a younger individual age 45-49, on the established
     disability onset date.  (*Id.*)

8.   The claimant has at least a high school education.  (*Id.*)

9.      The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity defined above.  (*Id.*)

10.     From August 2, 2017[,] through February 28, 2019, considering the claimant's age, education, work experience, and residual functional capacity, there were no jobs that existed in significant numbers in the national economy that the claimant could have performed.  (*Id.*)

11.     The claimant was under a disability, as defined by the Social Security Act, from August 2, 2017[,] through February 28, 2019.  (*Id.* at 29.)

12.     The claimant's history of substance abuse disorder(s) is not a contributing factor material to the determination of disability.  (*Id.*)

13.     The claimant has not developed any new impairment or impairments since March 1, 2019, the date the claimant's disability ended.  Thus, the claimant's current severe impairments are the same as that present from August 2, 2017[,] through February 28, 2019.  (*Id.* at 30.)

14.     Beginning March 1, 2019, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.  (*Id.*)

15.     Medical improvement occurred as of March 1, 2019, the date the claimant's disability ended.  (*Id.*)

16.     The medical improvement that has occurred is related to the ability to work because there has been an increase in the claimant's residual functional capacity.  (*Id.*)

17.     [B]eginning March 1, 2019, the claimant has had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except no lifting, carrying, pushing or pulling over 15 pounds; [*sic*] no climbing of ladders or stairs. He needs the option to change positions at 30-minute intervals, if needed.  He can perform no kneeling, crouching, or crawling.  (*Id.*)

18.     The claimant is unable to perform past relevant work.  (*Id.* at 34.)

19.     The claimant's age category has not changed since March 1, 2019.  (*Id.*)

20.     The claimant's education level has not changed.  (*Id.*)

21.     Beginning March 1, 2019, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as

a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  (*Id.*)

22.     Beginning March 1, 2019, considering the claimant's age, education, work experience, and residual functional capacity, there have been jobs that exist in significant numbers in the national economy that the claimant can perform.  (*Id.*)

23.     The claimant's disability ended March 1, 2019, and claimant has not become disabled again since that date.  (*Id.* at 35.)

Claimant subsequently requested an appeal to the Appeals Council, which denied his request for review on January 5, 2021.  (*Id.* at 1-6, 308-10, 421-35.)  At that point, the ALJ's decision became the final decision of the Commissioner.  *See* 20 C.F.R. § 422.210(a) (2021); *see also* 42 U.S.C. § 405(h) (discussing finality of the Commissioner's decision).  Pursuant to 20 C.F.R. § 422.210(c), Claimant is presumed to have received that decision five days later.  20 C.F.R. § 422.210(c).  Claimant timely filed this action on March 4, 2021.  (DN 1.).

## II.     DISCUSSION

The Social Security Act authorizes payments of DIB and SSI to persons with disabilities. *See* 42 U.S.C. §§ 404-434, 1381-1383f.  An individual shall be considered "disabled" if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a) (2021).

### A.     Standard of Review

The Court may review the final decision of the Commissioner but that review is limited to whether the Commissioner's findings are supported by "substantial evidence" and whether the Commissioner applied the correct legal standards.  42 U.S.C. § 405(g); *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  "Substantial evidence" means "more than a mere scintilla"; it means

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Court must "affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would also have supported the opposite conclusion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013); *see Smith v. Sec'y of Health & Hum. Servs.*, 893 F.2d 106, 108 (6th Cir. 1989) (holding that if the Court determines the ALJ's decision is supported by substantial evidence, the court "may not even inquire whether the record could support a decision the other way"). However, "failure to follow agency rules and regulations" constitutes lack of substantial evidence, even where the Commissioner's findings can otherwise be justified by evidence in the record. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

**B.      Five-Step Sequential Evaluation Process for Evaluating Disability**

The Commissioner has promulgated regulations that set forth a five-step sequential evaluation process that an ALJ must follow in evaluating whether an individual is disabled. 20 C.F.R. §§ 404.1520, 416.920 (2021). In summary, the evaluation process proceeds as follows:

(1)      Is the claimant involved in substantial gainful activity? If the answer is "yes," the claimant is not disabled. If the answer is "no," proceed to the next step.

(2)      Does the claimant have a medically determinable impairment or combination of impairments that satisfies the duration requirement[2] and significantly limits his or her physical or mental ability to do basic work activities? If the answer is "no," the claimant is not disabled. If the answer is "yes," proceed to the next step.

(3)      Does the claimant have an impairment that meets or medically equals the criteria of a listed impairment within 20 C.F.R. Part 404, Subpart P, Appendix 1? If the answer is "yes," the claimant is disabled. If the answer is "no," proceed to the next step.

---

[2] To be considered, an impairment must be expected to result in death or have lasted/be expected to last for a continuous period of at least twelve months. 20 C.F.R. §§ 404.1509, 416.909 (2021).

(4)     Does the claimant have the residual functional capacity ("RFC") to return to his or her past relevant work?  If the answer is "yes," then the claimant is not disabled.  If the answer is "no," proceed to the next step.

(5)     Does the claimant's RFC, age, education, and work experience allow him or her to make an adjustment to other work?  If the answer is "yes," the claimant is not disabled.  If the answer is "no," the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The claimant bears the burden of proof with respect to steps one through four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  However, the burden shifts to the Commissioner at step five to prove that other work is available that the claimant is capable of performing.  *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008).  The claimant always retains the burden of proving lack of RFC.  *Id.*; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 392 (6th Cir. 1999).

### C.     Evaluation Process for CDR

Where an individual has been found to be disabled, the regulations require that the individual's entitlement to benefits be periodically reviewed.  20 C.F.R. §§ 404.1594, 416.994 (2021).  The Commissioner has promulgated regulations that set forth an eight-step evaluation process for DIB claims and seven-step evaluation process for SSI claims that an ALJ must follow in conducting CDR.  In summary, the evaluation proceeds as follows:

(1)     Is the claimant engaged in substantial gainful activity? If the answer is "yes," and any applicable trial work period has been completed, the claimant's disability has ended.  If the answer is "no," proceed to the next step.[3]

(2)     Does the claimant have an impairment that meets or medically equals the severity of a listed impairment within 20 C.F.R. Part 404, Subpart P, Appendix 1?  If the answer is "yes," the claimant's disability will be found to continue.  If the answer is "no," proceed to the next step.

---

[3] Step one as identified herein only applies to Title II DIB claims.  *Compare* 20 C.F.R. § 404.1594(f)(1), *with* 20 C.F.R. § 416.994(b)(5)(i).  After the first step, the remaining analysis is identical.  *Compare* 20 C.F.R. § 404.1594(f)(2)-(9), *with* 20 C.F.R. § 416.994(b)(5)(i)-(viii).

(3)     Has there been medical improvement (i.e. any decrease in the medical severity of a claimant's impairments that were present at the time of the most recent favorable medical decision)?  If the answer is "yes," proceed to Step 4.  If the answer is "no," the claimant's disability will be found to continue unless any exception applies, and the analysis proceeds to Step 5.

(4)     Is the claimant's medical improvement related to his/her ability to do work (i.e. has there been an increase in the claimant's RFC based on the impairments that were present at the time of the most recent favorable determination)?  If the answer is "yes" and no exception applies, proceed to Step 6.  If the answer is "no," the claimant's disability will be found to continue unless any exception applies, and the analysis proceeds to Step 5.

(5)     Do any of the exceptions to medical improvement set forth in 20 C.F.R. §§ 404.1594(d)-(e), 416.994(b)(3)-(4) apply?   If the answer is "no," your disability will be found to continue.  If one of the first group of exceptions found in 20 C.F.R. §§ 404.1594(d), 416.994(b)(3) applies, proceed to Step 6.[4]  If one of the second group of exceptions found in 20 C.F.R. §§ 404.1594(e), 416.994(b)(4) applies, the claimant's disability has ended.[5]

(6)     Are the claimant's current impairments in combination severe (i.e. do they significantly limit his or her physical and mental ability to do basic work activities)?  If the answer is "no," the claimant's disability has ended.  If the answer is "yes," proceed to Step 7.

(7)     Does the claimant have the current RFC to return to his or her past relevant work?  If the answer is "yes," then the claimant's disability has ended.  If the answer is "no," proceed to Step 8.

(8)     Does the claimant's RFC, age, education, and work experience allow him or her to make an adjustment to other work?  If the answer is "yes," the claimant's disability has ended.  If the answer is "no," the claimant's disability continues.

---

[4] The first group of exceptions to medical improvement are where substantial evidence shows that: (1) a claimant is the beneficiary of advances in medical or vocational therapy or technology related to his or her ability to work; (2) a claimant has undergone vocational therapy related to his or her ability to work; (3) based on new or improved diagnostic or evaluative techniques, the claimant's impairment is not as disabling as it was considered to be at the time of the most recent favorable decision; (4) any prior disability decision was in error; or (5) for Title II claims only, the claimant is currently engaging in substantial gainful activity.  20 C.F.R. §§ 404.1594(d), 416.994(b)(3).

[5] The second group of exceptions to medical improvement are where: (1) a prior determination or decision was fraudulently obtained; (2) the claimant does not cooperate with the administration; (3) the administration is unable to find the claimant; or (4) the claimant fails to follow prescribed treatment that would be expected to restore the claimant's ability to engage in substantial gainful activity.  20 C.F.R. §§ 404.1594(e), 416.994(b)(4).

20 C.F.R. §§ 404.1594(f), 416.994(b)(5).

The decision whether to terminate benefits must "be made on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition, without any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled." 42 U.S.C. § 423(f); *see also* 20 C.F.R. §§ 404.1594(b)(6), 416.994(b)(1)(vi). Therefore, there is "no presumption of continuing disability." *Kennedy v. Astrue*, 247 F. App'x 761, 764 (6th Cir. 2007) (citing *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 287 (6th Cir. 1994)). Further, unlike the standards governing initial disability determinations, "the ultimate burden of proof lies with the Commissioner in termination proceedings." *Id.* at 765 (citing *Griego v. Sullivan*, 940 F.2d 942, 944 (5th Cir. 1991)); *see also Koch v. Kijakazi*, 4 F.4th 656, 663 (8th Cir. 2021).

### D.    Claimant's Contentions

Claimant challenged the ALJ's Findings Nos. 3, 15, 16, 17, 21, 22, and 23. (DN 15-1, at PageID # 2301.) He disputed the ALJ's Finding No. 3 regarding his severe impairments to the extent that the ALJ did not include multiple broken vertebrae as a severe impairment. (*Id.* at 2301.) He disputed Findings Nos. 15, 16, 17, 21, 22, and 23 on grounds that the ALJ improperly determined that he had medically improved to the point he was able to perform substantial gainful activity and improperly formulated his RFC in doing so. (*Id.* at 2301, 2304-08.) The undersigned will assess each of Claimant's arguments below.

#### 1.    Severe Impairments

Claimant argued that the ALJ erred in failing to categorize his broken vertebrae as a severe impairment. (DN 15-1, at PageID # 2301.) At step two of her initial determination of Claimant's disability, the ALJ found Claimant's severe impairments to include thoracic degenerative disc

disease, lumbar degenerative disc disease, right-sided rib fractures, left leg injury with residuals, and cervical degenerative disc disease.  (R. at 20-21.)  The ALJ specifically rejected Claimant's breathing-related symptoms/history of pneumothorax and history of left shoulder injury with remote surgical repair as possible severe impairments but did not discuss Claimant's broken vertebrae.  (*Id.* at 21 (citing *id.* at 440, 474, 483-84, 574, 583, 592, 610, 1515, 1950, 2205-06, 2217-18).)

Generally, an ALJ's failure to find a particular impairment to be severe does not constitute reversible error so long as the ALJ found the claimant had other severe impairments and moved on to the other steps prescribed by the regulations.  *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).  *See also Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009).  This is because the determination that an impairment is non-severe does not prevent an ALJ from considering it in his or her assessment of a claimant's RFC; instead, an ALJ is required to consider both severe and non-severe impairments in assessing a claimant's RFC.  *See* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) (2021).  Thus, "[t]he fact that some of [a claimant]'s impairments were not deemed to be severe at step two is therefore legally irrelevant." *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008); *see also Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020) (citing *Maziarz*, 837 F.2d at 244).

Here, the ALJ recognized in her decision that she was required to consider the impact of Claimant's non-severe impairments in making her other findings and stated that those impairments "ha[d] been taken into consideration in the findings" in her decision.  (R. at 21, 18.)  In her Finding No. 5 regarding Claimant's RFC between August 2, 2017, and February 28, 2019, the ALJ did note that Claimant suffered thoracic and lumbar fractures.  (*Id.* at 23; *id.* at 25 (citing *id.* at 439-

48, 450-52, 477-80, 482-85).)  The ALJ documented that Claimant's fractures continued to show on imaging through August and September 2017 but that by November 2017, his fractures were beginning to heal.  (*Id.* at 25 (citing *id.* at 573-76, 583, 1504).)  The ALJ noted that Claimant's T11 burst fracture had "healed" as of March 2018 despite Claimant's continuing complaints of pain.  (*Id.* at 25 (citing *id.* at 581).)  The ALJ's citation to these records evidences that despite failing to categorize Claimant's spinal and vertebral fractures as severe impairments, she did consider the fractures in determining Claimant's RFC.  Thus, the undersigned finds there to be no reversible error in the ALJ's Finding No. 3.

### 2.    Medical Improvement

Claimant disputes the ALJ's conclusion that medical improvement occurred in his condition as of March 1, 2019, that altered his RFC and enabled him to perform other work.  (DN 15-1, at PageID # 2301, 2304, 2306-07.)  Specifically, he argued that the ALJ's findings regarding alleged medical improvement are not supported by substantial evidence or logically tied to the medical evidence of record.  (*Id.*)  He emphasized that March 1, 2019, is not a medically significant date but is instead the date his worker's compensation settlement was finalized.  (*Id.* at 2360-07.)

"Medical improvement" is defined as "any decrease in the medical severity of impairment(s) present at the time of the most recent favorable medical decision that [claimant] w[as] disabled or continued to be disabled."  20 C.F.R §§ 404.1594(c)(1), 416.994(b)(2)(i). Medical improvement "is determined by a comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)."  20 C.F.R §§ 404.1594(c)(1), 416.994(b)(2)(i).  If the medical improvement is related to a claimant's ability to work and the claimant is able to

engage in substantial gainful activity, the claimant will no longer be found to be disabled. *Watts v. Comm'r of Soc. Sec.*, 179 F. App'x 290, 292 (6th Cir. 2006).

In her initial finding of Claimant's RFC for the period August 2, 2017, through February 28, 2019, the ALJ found that Claimant could perform sedentary work except do no lifting, carrying, pushing, or pulling greater than fifteen pounds; no climbing of ladders or stairs; and no kneeling, crouching, or crawling. (R. at 22.) She also found that Claimant needed the option to change positions every twenty minutes. (*Id.*) In support of her conclusion, she cited to Claimant's own testimony regarding his limitations and daily activities, his medical records, and the opinions of two independent medical examiners Dr. Rafid Kakel, M.D. ("Dr. Kakel") and Dr. Gregory B. Nazar ("Dr. Nazar"). (*Id.* at 22-28.) She noted that Claimant sustained serious injuries in a four-story fall onto a concrete floor while working in a warehouse as a result of which he sustained multiple fractures of his thoracic and lumbar spine as well as his ribs and that post-event imaging also showed evidence of degenerative disc disease. (*Id.* at 25 (citing *id.* at 436-90, 597-1498).) She recounted that after his initial hospitalization, Claimant was discharged to Frazier Rehabilitation Institute. (*Id.* at 25 (citing *id.* at 439-42).) She stated that Claimant was referred to pain management in September 2017 where he presented in "moderate" distress and his neurological exam findings showed marked tenderness on palpitation of his lower thoracic and lumbar spinous processes and right lumbosacral fact joints and transverse processes. (*Id.* at 25 (citing *id.* at 573-76).) She noted that Claimant had ongoing orthopedic follow up for his injuries. (*Id.* at 25 (citing *id.* at 578-86).) She also recounted some of the pertinent findings from his medical visits including that he still had tenderness to palpitation in his TL junction in November 2017, reported pain so bad it caused him to vomit in December 2017, and that he still had radiating tenderness from the mid-thoracic to lower lumbar spine in the right facet joints into the right rib in

March 2018. (*Id.* at 25 (citing *id.* at 495-97, 583, 1873).) She noted that by March 2018, Claimant was managing his pain with over-the-counter medications and physical therapy. (*Id.* at 25 (citing *id.* at 495-97).) He was discharged from pain management. (*Id.*) The ALJ emphasized that Claimant's physical examination was "somewhat unremarkable" during a March 2018 visit with his orthopedist and that his T11 fracture had healed despite his continued complaints of muscle spasms. (*Id.* at 25 (citing *id.* at 581).) She also emphasized that he was discharged from physical therapy in April 2018 "with at least some gains (noted with 'maximum' benefit)." (*Id.* at 25 (citing *id.* at 1960, 2197).) She then summarized that at his July 2018 visit with his orthopedist, Claimant was in no acute distress; had a slight antalgic gait but with guarding secondary to back pain; had moderate to extreme bilateral para-spinal muscle tenderness; demonstrated negative straight leg raise; and demonstrated decreased range of motion in all planes secondary to pain. (*Id.* at 26 (citing *id.* at 1950).) The ALJ emphasized, "His clinical assessment was 'stable, healed' T11 compression fracture with 'chronic muscular pain unresponsive to treatment,' " and that Claimant was released by his orthopedist at that time. (*Id.*) The ALJ noted that Claimant declined further pain management. (*Id.*) The ALJ also emphasized that by March 1, 2019, it appeared that the Claimant was no longer actively treating, citing his worker's compensation settlement agreement. (*Id.* at 26 (citing *id.* at 346-51).)

The ALJ also summarized the physical findings of independent medical examiners Drs. Kakel and Nazar. (*Id.* at 25.) Dr. Kakel's examination showed that Claimant had antalgic/slow gait; diminished range of motion in his thoracic, lumbar, and cervical spine; and decreased sensation of his left lateral leg. (*Id.* at 25 (citing *id.* at 591-93).) Dr. Nazar's examination also showed limited spinal range of motion, decreased light touch sensations involving Claimant's anterolateral right leg, and a slow gait and stiff posture. (*Id.* at 25-26 (citing *id.* at 1947).) Dr.

Kakel opined that Claimant should have the following work restrictions: no climbing ladders; only occasional climbing of stairs; no lifting, carrying, pushing, or pulling greater than fifteen pounds; using his hands above his waist constantly but below his waist only occasionally; only occasional stooping and bending; and no kneeling, crouching, or crawling.  (*Id.* at 27 (citing *id.* at 594).)  The ALJ found Dr. Kakel's opinion partially persuasive for the period August 2, 2017, through February 28, 2019.  (*Id.* at 27.)  She rejected Dr. Kakel's manipulative limitations because they were not supported by Dr. Kakel's own findings.  Dr. Nazar agreed with Dr. Kakel's lifting, carrying, pushing, pulling restriction but also found that Claimant should avoid stairs and ladders, change position frequently every twenty to thirty minutes, and only drive limited distances.  (*Id.* at 27 (citing *id.* at 1949).)  The ALJ found Dr. Nazar's opinion generally persuasive from August 2, 2017, through February 28, 2019, but limited Claimant to changing position every twenty minutes based on Dr. Nazar's evaluation findings and "to better account for the combination of [Claimant]'s severe impairments."  (*Id.* at 27.)

However, the ALJ proceeded to find that as of March 1, 2019, medical improvement related to Claimant's ability to work had occurred that increased Claimant's RFC.  (*Id.* at 30.)  Specifically, as of March 1, 2019, the ALJ found Claimant could change position every thirty minutes instead of every twenty minutes, a distinction which the vocational examiner found significant as it allowed the Claimant to perform other work in the national economy such that he was no longer disabled.  (*Id.* at 30-35.)  In support of her finding of medical improvement, the ALJ referred to the record of Claimant's October 2019 pain management visit at which he had normal walking on a straight line, tenderness of his cervical spine, reduced range of spinal motion with mild pain, intact upper extremity strength, mild tenderness in his thoracic and lumbar spine, and "other . . . unremarkable findings regarding his bilateral lower extremities."  (*Id.* at 31 (citing *id.*

at 2215-19).)  She noted that pain management recommended cervical injections and described his prognosis as "good."  (*Id.*)  The ALJ emphasized that the post-hearing consultative examiner, Dawn Raikes, MSN, FNP ("Ms. Raikes"), found in her physical exam findings that Claimant could flex, extend, and rotate his neck with a deficit of fifty degrees of neck rotation bilaterally and extension decreased to forty degrees; had decreased range of motion in his shoulders but otherwise full range of motion in his joints; had decreased flexion extension of forty degrees and decreased lateral flexion of twenty degrees bilaterally with indication of straight leg raises with radicular pain at forty degrees; ambulated with steady gait; had 4/5 muscle strength; could walk on toes and heels without pain; could tandem walk; could not squat without knee pain; and had grip strength of 5/5 on his right hand and 4/5 on his left hand.  (*Id.* at 31.)  Ms. Raikes opined that Claimant could occasionally lift/carry up to twenty pounds; sit for 1-hour at a time; stand and/or walk for thirty minutes at a time; never perform overhead reaching bilaterally; occasionally perform all other reaching, handling, fingering, feeling, and pushing/pulling bilaterally; occasional operate foot controls; occasionally climb ramps/stairs and balance; never climb ladders or scaffolds; never balance, stoop, kneel, crouch, or crawl; and have occasional exposure to certain specified hazards. (*Id.* at 31 (citing *id.* at 2208-14).)  The ALJ found Ms. Raikes's opinion partially persuasive, rejecting the environmental and manipulative limitations as inconsistent with the record.  (*Id.*)  But, pivotally, the ALJ relied on Ms. Raikes opinion to state that Claimant would need to change positions every thirty minutes.  (*Id.*)  As to the opinion of Dr. Kakel, she found it only partially persuasive for the period since March 1, 2019, stating, "[I]t appears more reasonable to limit the [C]laimant further to no climbing of stairs, as well as to provide a sit/stand option at 30-minute intervals."  (*Id.* at 32.)  She likewise found Dr. Nazar's opinion only partially persuasive for the

period since March 1, 2019, incorporating the same limitations on Dr. Kakel's analysis for consistency with the record.  (*Id.*)

Ultimately, the ALJ emphasized that Claimant was no longer undergoing treatment as of March 1, 2019; had a gap in his pain management treatment; and "has had only limited and rather conservative care since March 1, 2019."  (*Id.* at 31.)  She noted that Claimant had indicated he had not completed his first round of cervical injections due to the COVID-19 pandemic and that he had not followed up with pain management until the latter part of 2019 despite being discharged by his treating orthopedist in July 2018.  (*Id.*)  Given this evidence, she found that "based on the combination of his severe impairments it appear[ed] reasonable to continue to limit [Claimant] to sedentary exertional level work, including the need to change positions at 30-minute intervals, if needed" to "adequately account[ ] for some level of ongoing pain and discomfort."  (*Id.* at 31.) She emphasized that this was consistent with Claimant's own testimony about changing positions every thirty minutes.  (*Id.* at 32.)

"Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) (quoting *Craig v. Apfel,* 212 F.3d 433, 436 (8th Cir. 2000)); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for his decision to stand.").  However, the Court examines the record as a whole, including whatever evidence "in the record fairly detracts from its weight," without "resolv[ing] conflicts in evidence or decid[ing] questions of credibility" to determine whether an ALJ's decision is supported by substantial evidence.  *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 253 (6th Cir. 2016) (quoting in part *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)  and citing *Ulman v. Comm'r*

*of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012)).  While the threshold for substantial evidence is "not high" and here the ALJ did provide a detailed discussion of the record, the undersigned cannot say that her conclusion about Claimant's medical improvement is supported by substantial evidence. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) ("Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations.  And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high.").

As emphasized by Claimant in his brief, the March 1, 2019, date as of which the ALJ found medical improvement has no established relationship to the medical record.  It does not correspond to the date of any particular medical findings, diagnosis, or medical opinion.  Instead, it corresponds to the date on which Claimant made a legal admission as part of his worker's compensation settlement that he was no longer actively treating.  *See* R. at 349 (stating under the heading "MEDICAL INFORMATION" that "plaintiff is not actively treating").  The applicable regulations provide that the ALJ will determine medical improvement by comparing "prior and current *medical* evidence which must show that there have been changes (improvement) in the *symptoms, signs or laboratory findings* associated with that impairment(s)."  20 C.F.R §§ 404.1594(c)(1), 416.994(b)(2)(i) (emphasis added).  Claimant's worker's compensation settlement agreement contains no such medical evidence or documentation of symptoms, signs, or laboratory findings.  Instead, the medical evidence demonstrates that Claimant had no treatment between his discharge by his orthopedist on July 25, 2018, and his October 30, 2019, visit to pain management, a period inclusive of though unrelated to the March 1, 2019, date seized upon the ALJ.  (*Compare* R. at 1950, *with id.* at 2215-19.)

At the time of his discharge, his orthopedist noted that Claimant still had a slightly antalgic gait, moderate-to-extreme paraspinal muscle tenderness, and decreased range of motion in all planes secondary to pain.  (*Id.* at 1950.)  Despite the orthopedist's assessment that Claimant had a stable, healed T11 compression fracture, the physician noted that Claimant had "chronic muscular pain unresponsive to treatment" and was being released from treatment unless Claimant wanted a referral for additional pain management.  (*Id.*)  Despite evidence he was discharged from pain management for marijuana use, at his final pain management visit at Flaget Memorial on March 26, 2018, Claimant reported using over-the-counter medications to manage his pain because he couldn't tolerate the side effects of the prescription ones.  (*Id.* at 495-97.)  When he was discharged from physical therapy on April 12, 2018, his therapist noted that despite his gains in trunk range of movement, hip strength, and gait speed, Claimant still had decreased findings in those areas and was being discharged because he had "obtain[ed] maximum benefit from skilled PT interventions at th[at] time."  (*Id.* at 1960, 1962.)  Drs. Nazar and Kakel found that Claimant had reached maximum medical improvement as of the dates of their respective evaluations in May and June 2018 respectively.[6]  (*Id.* at 594, 1948.)  Though the ALJ faulted Claimant for his gap in treatment and conservative care, the records appears to support a conclusion that Claimant stopped treating because no one could alleviate his symptoms, not because his symptoms stopped existing.  The ALJ did not address this issue in her decision.  The undersigned also finds the ALJ's skeptical references to Claimant's "conservative care" less than dispositive of the issue of medical improvement given that Claimant's own providers prescribed conservative care for him following his accident.  (*See id.* at 573 ("He was evaluated by Surgery and recommended conservative

---

[6] Though Dr. Kakel's examination report is dated May 24, 2017, this is a typographical error given that Claimant's injuries did not occur until August 2, 2017.  (*Compare id.* at 591, *with id.* at 440, 584.)  Accordingly, the undersigned finds that Dr. Kakel's examination was likely performed on May 24, 2018, as noted in the worker's compensation settlement document in the record.  (*Id.* at 349.)

treatment was prescribed a TLSO brace.").)  Though the ALJ referred in her medical improvement finding to Claimant's conservative care after March 1, 2019, the record actual supports that the Claimant received conservative care consistently since his August 2017 injuries.

The undersigned also finds the ALJ's conclusion regarding Claimant's sudden ability to change positions every thirty minutes as opposed to every twenty minutes less then supported by either her analysis or the record.  Dr. Nazar, whose opinion was rendered approximately a month before Claimant was released by his treating orthopedist, opined that Claimant would need to change positions every twenty to thirty minutes.  (*Id.* at 1949.)  As noted above, based on this opinion, the ALJ found that for the period from August 2, 2017, through February 28, 2019, Claimant could only change position every twenty minutes and that this limitation was supported by Dr. Nazar's findings and the "medical evidence of record during that time (from August 2, 2017, through February 28, 2019), as the claimant was recovering from series injuries from traumatic fall and to better account for the combination of his severe impairments."  (*Id.* at 27.) However, for the period March 1, 2019, through the date of her decision, the ALJ found that Claimant could change positions every thirty minutes based "the medical evidence on whole since March 1, 2019."  (*Id.* at 32.)  The medical evidence of record contains no findings from the period July 25, 2018, through Claimant's first visit to a new pain management physician on October 30, 2019.  (*Id.* at 1950, 2215-19.)  Thus, it is unclear on what "medical evidence" the ALJ could be relying for that period.  The administrative record contains only Ms. Raikes's examination and three pain management visits that post-date March 1, 2019.  Of the three pain management visits, only one contains any physical examination findings as the other two are records of the Claimant receiving cervical epidural steroid injections.  (*Compare id.* at 2215-19, *with id.* at 2220-23.)  The third remaining record documents normal walking on a straight line; tenderness along Claimant's

cervical, thoracic, and lumbar spine; diminished cervical range of motion; thoracic range of motion within normal limits; and a note that Claimant's lumbar spine/pelvic area were within normal limits.  (*Id.* at 2217-18.)  Of those findings, only the normal walking and normal range of motion findings regarding Claimant's thoracic and lumbar spine are inconsistent with the prior medical opinions of record and findings by Claimant's providers.  The findings regarding Claimant's lumbar spine are, however, also inconsistent with the subsequent findings of Ms. Raikes during her examination.  (*See id.* at 2206 ("[Claimant] had decreased range of motion in lumbar spine with flexion extension and lateral flexion.").)  Thus, the ALJ appears to be relying on anomalies in the record in forming her opinion about Claimant's RFC improving.  In particular, even if Claimant's ability to ambulate had improved and his gait had normalized, it is unclear how that improvement relates to Claimant's need to change positions either every twenty or every thirty minutes, which is the key distinction on which the ALJ's finding that Claimant can perform other work turned.  The undersigned likewise finds that Ms. Raikes's opinion does not support this limitation as she herself did not conclude that Claimant needed to change positions every thirty minutes.  Her evaluation stated that Claimant "may have difficulty with prolonged, walking, sitting, and standing."  (*Id.* at 2206.)  Then in the check box evaluation attached to her narrative report, she indicated that Claimant could sit for an hour at a time, stand for thirty minutes at a time, and walk for thirty minutes at a time.  (*Id.* at 2209.)  Thus, while her opined limitations on sitting/standing/walking may suggest a need to change positions every thirty minutes, she did not explicitly render such a limitation.  And her opined limitations do not provide any link between alleged improvement and the date March 1, 2019, selected by the ALJ.  The ALJ does not address these issues in her decision.  Given the consistent findings regarding Claimant's spinal pain and limited range of motion both pre-dating and post-dating the March 1, 2019, improvement date

selected by the ALJ, the undersigned simply cannot see the logic or supporting evidence behind her conclusion regarding Claimant's alleged medical improvement and, thus, finds that the same is not supported by substantial evidence.  These deficiencies are particularly troubling because the burden of proof at the medical improvement stage rests with the Commissioner, not the Claimant. *Kennedy*, 247 F. App'x 764.

While it is not this Court's role to reweigh the evidence or decide questions of credibility, the record raises too many questions and inconsistencies not answered or addressed by the ALJ in her analysis to conclude that  the same was based upon substantial evidence.  Accordingly, the undersigned recommends that the ALJ's decision be reversed and that this matter be remanded for further consideration of the issue of medical improvement.

## III.   RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that final decision of the Commissioner be **REVERSED** and that this matter be **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), to the Commissioner to conduct additional proceedings to remedy the above-identified defects in the original proceedings.

Colin H Lindsay, Magistrate Judge
United States District Court

cc:    Counsel of Record
        August 2, 2022

### Notice

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations.  A copy shall forthwith be electronically transmitted or mailed to all Parties. 28 U.S.C. § 636(b)(1)(C).  Within fourteen (14) days after being served, a party may serve and file specific written objections to these findings and recommendations.  Fed. R. Civ. P. 72(b)(2).  Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal.  *Id.; United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985).